**UNITED STATES of America,
Appellee,**

v.

**Peter OTTLEY, Defendant-Appellant.**

**No. 185, Docket 74–1731.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 11, 1974.

Decided Jan. 7, 1975.

Joel N. Rosenthal, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., Lawrence S. Feld, Asst. U. S. Atty., on the brief), for appellee.

Seymour M. Waldman, New York City (Waldman & Waldman, Louis Waldman, New York City, on the brief), for defendant-appellant.

Before FRIENDLY, FEINBERG and GURFEIN, Circuit Judges.

FEINBERG, Circuit Judge:

Union president Peter Ottley appeals from a judgment of conviction on three counts of a 46-count indictment charging him with violations of the Labor Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 401 et seq., and the Welfare and Pension Plan Disclosure Act, 29 U.S.C. § 301 et seq. Ottley was tried before a jury and Judge Marvin E. Frankel in the United States District Court for the Southern District of New York and sentenced to three months imprisonment and a $15,000 fine on the three counts. Of the 46 counts in the indictment, two were dismissed on the Government's motion prior to trial and 21 were dismissed at the close of the Government's case; the jury acquitted Ottley of all but three of the remaining 23 counts, including all the embezzlement charges where Ottley was indicted as a principal. Ottley was found guilty on two counts of aiding and abetting Peter Byrne, another union official, to embezzle union funds in violation of 29 U.S.C. § 501(c) by leasing and maintain-

ing, at union expense, an automobile for the personal use of Byrne's wife, and on one count of failure to maintain records in sufficient detail to substantiate Ottley's claim for weekly reimbursed cash expenses, as required by 29 U.S.C. § 436. For reasons indicated below, we reverse and remand for a new trial on these three counts.

### The facts

During the 1968–1972 period covered by the indictment, Ottley was president of Local 144, Service Employees International Union, AFL–CIO, an organization representing hotel, hospital, and nursing home employees in the greater New York City area. He was also a member of the Executive Board of the International and on the Boards of Trustees of many of the welfare and pension funds associated with the union. First elected chief executive officer of his union in 1950, Ottley had been a leading force in its growth and success.

In the same period, Peter Byrne was the secretary-treasurer of the Local and the second man in the union hierarchy after Ottley. He was indicted along with Ottley, and on the two automobile embezzlement counts in which Ottley was charged as an aider and abettor, Byrne was the principal. In January 1974, Byrne pleaded guilty to a single misdemeanor, which would not bar him from further union office, and was sentenced to six months probation and a $500 fine.[1] The two automobile counts against Byrne were dropped. Ottley's conviction, however, bars him both from holding union office [2] and also, we are told, from receiving his pension of approximately $15,000 per year for life. Ottley is now 66 years of age.

The two automobile embezzlement counts involved the payment out of union funds over a four-year period of $9,067.18 to the lessor of an automobile for Byrne and $2,726.12 to Texaco Oil Company on credit card charges. Ottley

testified that Byrne had asked for the car to take care of union business and that he did not know or inquire whether Byrne had a license or knew how to drive. Byrne, on the other hand, said that he had told Ottley he had no license and could not get one because of his poor eyesight. Byrne testified that the automobile was used by his wife each day to commute from their New Jersey home to her job at a Manhattan hospital and that normally he would accompany her into the City to a convenient subway station from which he would continue to union headquarters. The credit card slips for the maintenance of the automobile were generally signed by Mrs. Byrne at a service station near their home, and Ottley approved their payment by the union. Byrne testified that since he used the car to get back and forth from work he thought it served a union purpose. Ottley said that he did not inquire how the car was being used but assumed it was used for union purposes. However, Byrne apparently took cabs, for which he was reimbursed, when he conducted union business out of the office. The Byrne automobile was but one of a number leased by the Local for use by union officials, only one of which (Ottley's), apparently, was specifically authorized.

On the failure to maintain records counts, most of the evidence was not in dispute. Ottley and Byrne were the only two union officers authorized to receive reimbursed expenses for monies expended on union business. Each week they submitted petty cash vouchers showing the week's expenses and were reimbursed that amount. As a rule they did not keep bills or receipts for those expenses. Ottley testified that he did not know that more detailed records were required to be kept. On this issue, the Government introduced circumstantial evidence, described later, to prove Ottley's knowledge of his fiduciary responsibilities.

---

1. The plea was to count five of the indictment, which charged Byrne with causing the union to make a loan to Ottley of $17,709 in

violation of 29 U.S.C. § 503(a) ($2,000 limit on indebtedness of union official to union).

2. 29 U.S.C. § 504(a).

On appeal, Ottley claims that on the automobile embezzlement counts the judge's charge to the jury was incorrect and that there was insufficient evidence to convict. On the failure to maintain records count, Ottley argues, inter alia, that there was insufficient evidence to establish a knowing and wilful failure to comply with the statute, that the court erroneously charged the jury on these elements, that Ottley was not a "person" required to file the records, and that various evidentiary rulings were improper.

*The automobile embezzlement counts*

Ottley's first contention is that the court improperly charged the jury on the automobile embezzlement counts. While the court's charge on the 22 embezzlement counts presented to the jury was extensive, the essence of the charge under 29 U.S.C. § 501(c) was:

> In the circumstances of this case and in the circumstances of all the charges of embezzlement, you will have to consider a central question of these two matters, first whether the particular expenditure you are considering was in fact duly authorized by the union under its prescribed procedures; second, whether, even if the expenditure was not authorized, the defendant believed in good faith that he had authority to make that expenditure.

Defense counsel had requested a charge that if Ottley believed that the expenditures would benefit the union or "that they had been or would be authorized" by the union, he would not be guilty of violating section 501(c). The court, however, refused to so charge.

The proper interpretation of section 501(c), which is reproduced in the margin,[3] was considered by this court in United States v. Silverman, 430 F.2d 106 (2d Cir.), modified on other grounds, 439

F.2d 1198 (2d Cir. 1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971). In that case, Judge Friendly, writing for the majority,[4] pointed out that section 501(c) is a "larceny-type" statute, paralleling many other "larceny-type" offenses in the criminal code. Citing Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), the majority said that the common thread of these statutes is

> that the defendant, at some stage of the game, has taken another person's property or caused it to be taken, knowing that the other person would not have wanted that to be done

and that, in enacting section 501(c)

> Congress subjected union officers or employees to the same test of criminal liability as government employees, bank officers and the like—not to a lower one.

430 F.2d at 126–127. As in *Silverman*, the Government's claim here is not that Ottley

> "embezzled" or "stole" the unions' assets in the ancient sense of those terms; the claim is that he unlawfully and willfully converted monies to the use of another. It is easy to understand how a union employee does this when he "unlawfully and willfully" uses union funds in a manner that works to the personal benefit of himself or the payee and does not benefit the union, whether or not the union went through the form of authorization; the "union" presumably would have objected if it had been able to speak freely. Such was this court's holding in United States v. Dibrizzi, 393 F.2d 642, 645 (2nd Cir. 1968), and the First Circuit's in Colella v. United States . . . ..

430 F.2d at 127. The majority in *Silverman* then went on to say that the insuffi-

---

3. 29 U.S.C. § 501(c) reads:
   (c) Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is

   employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

4. Judge Hays concurred and Judge Moore dissented on the counts that were the occasion for the discussion quoted hereafter.

ciency of evidence made it unnecessary to decide

> whether a payment made in a bona fide belief that it was for a union's benefit and that it had been authorized or would be ratified can ever be swept under 29 U.S.C. § 501(c)
>
> . . . .

Id. However, the majority characterized that proposition as "doubtful" and also cited with approval, as already indicated, Colella v. United States, 360 F.2d 792, cert. denied, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966). In that case, the First Circuit noted with approval a charge under section 501(c) that, in effect, told the jury to acquit "if the jury felt that the defendant had spent for a union purpose, albeit unauthorized." 360 F.2d at 798–799, 804.

■■■ The central question in a case such as this is usually whether the defendant had the requisite criminal intent. Under *Silverman*, we do not think that issue can be narrowed solely to whether the expenditure of union funds had been authorized or whether defendant believed that to be the case. If Ottley in good faith believed that Byrne's automobile was being used for union business *and* that the union had authorized the expenditure or would ratify it, he did not violate section 501(c). Whether the expenditure did benefit the union would, of course, be relevant to Ottley's alleged bona fide belief that it did.

In short, we believe that the judge's charge unduly limited the jury's consideration of criminal intent. The Government argues that *Silverman* is not dispositive, first by quoting at length from Judge Moore's dissent and then by attempting to distinguish the majority opinion. The view of the dissent, of course, does not control even when the dissenter, as in *Silverman*, wrote the majority opinion on the remaining counts as to which the panel agreed. The Govern-

ment also claims that the majority in *Silverman* "did not discuss the component elements of the crime under 501(c), but assumed *arguendo*, that Judge Moore's formulation was correct, and reversed for insufficient evidence." [5] While the last two statements are accurate, what we have already quoted shows that the first is not. The Government also cites to us the recent decision in United States v. Goad, 490 F.2d 1158, 1165–1166 & n. 10 (8th Cir.), cert. denied, 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974), for the proposition that a belief in union benefit is not a defense to a section 501(c) charge. On its facts, *Goad* is distinguishable since it involved unauthorized and secret pay raises for union leaders, who had repeatedly refused to answer inquiries by the membership with respect to the level of their compensation. This was an unlikely situation for a credible defense of good faith belief that the expenditures benefited the union and that the membership would have ratified the increases if asked to. On the other hand, the evidence in this case indicated that many other cars were leased by the union (also without specific authorization) for the bona fide use of its business agents.[6] This seems to us to be quite different. In any event, to the extent that there is language in *Goad* contrary to our holding here, we respectfully disagree.

Finally, the Government argues that the construction we adopt here will emasculate the statute and frustrate its clearly beneficent purpose. We do not agree. Clearly, a jury would be free to disbelieve a union official who, to repeat an example used by the court below, said that the unauthorized sauna he installed at union expense in the basement of his home was for the union's benefit because it made him feel much healthier and would have been approved had he asked the union to do so. Some expenditures

---

5. Government's brief at 17.

6. If the Government were correct in its contention that lack of prior authorization or good faith belief in prior authorization were all that was required to convict under

§ 501(c), then Ottley could have been convicted for all of these cars as well. If these cars actually were used for union business, as seems to be the case, we doubt that Congress intended to hold such expenditure criminal.

are so clearly personal in nature that such a claim is scarcely credible. Other expenditures—like providing an automobile for another union official—are not so clearly personal, and it is in just such a grey area that we must be careful not to "enlarge the reach of enacted crimes" [7] by unduly narrowing the concept of criminal intent. While the test for liability of a union officer suggested by the Government may be valid in a civil suit under 29 U.S.C. §§ 501(a), (b) to recover monies spent, we do not think it proper in a criminal action.

Because the jury's consideration of criminal intent was unduly circumscribed, we must reverse Ottley's conviction on the two automobile counts. We do not, however, find the evidence insufficient to support a guilty verdict from a properly instructed jury. Evidence was presented by the Government from which a jury could find that Ottley knew that Byrne was unable to drive and was not using the automobile for union business. If the jury were to so find, it would be free to disbelieve the proffered evidence of good faith belief in union benefit and return a verdict of guilty. For these reasons, we remand for a new trial on the automobile embezzlement counts.

### The maintenance of records count

■ We turn now to the appeal from the conviction for violating 29 U.S.C. § 436, on which Ottley raises a number of issues. We need discuss at length only a few because we are persuaded that the combined effect of two of the trial court's rulings and the reversal on the automobile counts make a new trial advisable on this count as well.

Section 436 provides that:

Every person required to file any report under this subchapter shall maintain records on the matters required to be reported which will provide in sufficient detail the necessary basic information and data from which the documents filed with the Secretary may be verified, explained or clarified, and checked for accuracy and completeness, and shall include vouchers, worksheets, receipts, and applicable resolutions, and shall keep such records available for examination for a period of not less than five years after the filing of the documents based on the information which they contain.[8]

Under 29 U.S.C. § 439(a), any person who "willfully" violates this provision is liable to a year in prison, or a fine of $10,000, or both. The district judge charged the jury that an act committed "knowingly and wilfully" is one committed with a wrongful purpose. Then the jury was told that this would be established if the defendant knew what the law required but failed to comply with it, or if he acted in reckless disregard of the law's requirement. Finally, the judge defined reckless disregard as "closing of the eyes or deliberate indifference or refusal to be informed." Despite Ottley's claim to the contrary we believe that all of this was correct. United States v. Budzanoski, 462 F.2d 443, 452 (3d Cir.), cert. denied, 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972).

One aspect of this portion of the charge, however, is troublesome. Just before explaining, in the language quoted above, what "reckless disregard" meant, the district judge stated:

Knowledge and wilfulness may not be established if the failure to main-

---

7. This language from Morissette v. United States, *supra,* 342 U.S. at 263, 72 S.Ct. at 250, was quoted by this court in United States v. Ferrara, 451 F.2d 91, 95 (2nd Cir. 1971).

8. Ottley argues that he is not a "person required to file any report under this subchapter." Like the district judge, we see no merit in this contention. Section 439(d) provides that "Each individual required to sign reports under section 431 . . . of this title shall

be personally responsible for the filing of such reports . . . ." Ottley, as union president, was required by § 431 to sign reports under that section. Thus, he was responsible for the filing of such reports. In addition, the legislative history of the LMRDA indicates personal as well as union accountability was intended. See 2 U.S.Code Cong. & Admin.News, 86th Cong., 1st Sess. 1959 at p. 2326 (S.Rep. 187).

tain the required records resulted from mere negligence or oversight, *especially if the defendant had made reasonable efforts to know his fiduciary obligations as a union officer.* [Emphasis added.]

Ottley argues that the "especially" clause completely diluted the statement that mere negligence was not enough for criminal liability and erroneously allowed the jury to believe that the failure to make reasonable efforts was enough to constitute knowledge and wilfulness. It is true, as Ottley emphasizes and the district judge recognized, that mere negligence would not constitute criminal behavior here, cf. United States v. Williams, 478 F.2d 369, 373 (4th Cir. 1973). But, according to Ottley, what the underlined words conveyed was that negligence is not enough, if the defendant made reasonable (that is, nonnegligent) efforts to know his obligations. Or—to refine the charge further—negligence is not enough, unless the defendant was negligent in failing to know his obligations. Ottley argues that this charge was incorrect and, at the very least, fatally confusing. It is true that any possible confusion created by the quoted language might have been dispelled by the next paragraph of the charge, which correctly defined reckless disregard. We are not sure that a jury would understand the quoted language to mean what Ottley suggests. But neither are we sure that it would not. Nevertheless, there was no objection to this portion of the charge, and were this the only allegation of error we would be reluctant to require a new trial on this count. As we shall see, however, another ruling of the district judge gives us pause.

One of the principal claims on appeal is that there was insufficient evidence that Ottley "wilfully" violated section 436. With due regard for the salutary purpose of the LMRDA,[9] we conclude that a jury could properly have found

that Ottley either knew of his fiduciary responsibilities in general and the record-keeping requirement in particular and ignored them, or consciously avoided learning of them. The evidence we find significant includes the following: In 1959, shortly after the enactment of the LMRDA, Ottley, as union president, signed a form which included above his signature the record-keeping requirements of the law and a statement that the signatories had read and verified all the information contained therein. He also admitted that he was aware of the general purposes of the LMRDA and knew that it was "restrictive type" legislation. Also admitted into evidence were minutes of a union Executive Board meeting where it was stated "Brother Ottley reported that in order to comply with our International Constitution and the Landrum-Griffin Law [LMRDA] we would have to make changes in our Constitution." Furthermore, there was evidence that from 1959 on Ottley attended meetings where attorneys briefed the various labor leaders in attendance on their obligations under the LMRDA, and that his local regularly received material from its attorneys and the International's attorneys regarding the new law.[10]

We do not suggest, however, that the case against Ottley on the record-keeping count was overwhelming. It was far from that, and, under these circumstances, one of the evidentiary rulings during the trial takes on particular significance. During direct examination by his defense counsel, Ottley was asked if he had ever had a problem with the Internal Revenue Service concerning reimbursed expenses. He answered that he had been "summoned to appear" but was able to explain the expenses and had submitted a memorandum to the Service. Before the questioning went any further a side bar conference was called in response to the Government's objections. Ottley's attorney explained that his

**9.** The Act was passed to "prevent, discourage, and make unprofitable improper conduct on the part of union officials . . . by requiring reporting of certain arrangements, actions, and interests." 2 U.S.Code Cong. & Admin.News, 86th Cong., 1st Sess.1959 at p. 2427 (H.R.Rep.741).

**10.** We agree with the Government that the trial judge properly admitted evidence concerning these documents and meetings.

client had been told by the Internal Revenue Service that his record keeping was sufficient, and therefore the testimony was highly relevant to the question of Ottley's intent to evade the record-keeping requirements of the labor law regarding the same reimbursed expenses. Nonetheless, the court excluded this line of questioning.

■■ Normally we would not reverse a conviction on an evidentiary ruling within the discretion of the trial court, United States v. Gottlieb, 493 F.2d 987, 992 (2d Cir. 1974). We would not do so here on this point alone, but we would not have shut off this line of inquiry. Whether the information was credible or had any significance to an attorney does not bear on its admissibility. Since the chief issue before the jury on the record-keeping count was Ottley's state of mind, exclusion of this testimony may well have affected the trial's outcome. United States v. Matot, 146 F.2d 197 (2d Cir. 1944) (L. Hand, J.), is on point. There the trial court had refused to admit a conversation between defendant and a bank official that might have negated defendant's intent to defraud the bank. Because defendant was entitled to such evidence, since it could logically corroborate his denial of intent to defraud, the court reversed; Judge Hand noted that "while in a clearer case" the error might be disregarded, in a close case it could not be. See also United States v. Platt, 435 F.2d 789, 793 (2d Cir. 1970). Here, too, the issue was close. Ottley's acquittal on 20 of the 23 counts submitted to the jury and the jury deliberations over a three-day period are evidence of that. To a jury of laymen, acceptance of record keeping on reimbursed expenses by the Internal Revenue Service and a defendant's testimony as to the effect of this incident on him may seem important. Of course, the Govern-

ment would be free to try and prove that such advice was never given or that Ottley did not really rely upon it or that it was reckless of him to do so.

■ We are thus left on the record-keeping count with an uneasy feeling occasioned by a possibly confusing charge on the crucial question of criminal intent, a questionable evidentiary ruling affecting the same issue and the knowledge that in this long trial covering many counts, relatively little attention was given to the three counts on which Ottley was convicted, and two of those must be retried, in any event. Under the circumstances, we believe that a new trial on the record-keeping count, along with the two automobile counts, is in the interests of justice. See Benton v. Maryland, 395 U.S. 784, 797–798, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); United States v. Barash, 365 F.2d 395, 403 (2d Cir. 1966); United States v. McGee, 426 F.2d 691, 705 (2d Cir. 1970) (dissenting opinion), aff'd, 402 U.S. 479, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971).

Ottley raises a few other issues on appeal, and, to save uncertainty at any retrial, we note that we do not regard appellant's other arguments as well-founded. Briefly, the records Ottley kept were not necessarily sufficient as a matter of law as Ottley maintains.[11] The issue was one for the jury and the judge's instructions about the background and purpose of the LMRDA on the point were adequate. There is no merit to the claim that 29 U.S.C. § 436 is unconstitutionally vague. See United States v. Budzanoski, supra, 462 F.2d at 452; United States v. Haggerty, 419 F.2d 1003, 1007–1008 (7th Cir. 1969), cert. denied, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970).

Judgment reversed and case remanded for further proceedings consistent with this opinion.

11. The voucher slips he submitted were minimal. They contained only the date, the amount received from the union, his signature and the notation "for reimbursed expenses." Even Byrne, who also submitted vouchers, at least included a breakdown of how the money was spent on the reverse side of the slip.